Mike DIAZ, Petitioner,

v.

A.W. CASTALAN, Warden, Respondent.

No. CV 06–2434–FMC (RNB).

United States District Court,
C.D. California.

Dec. 30, 2008.

Mike Diaz, Crescent City, CA, pro se.

## ORDER ADOPTING FINDINGS, CONCLUSIONS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

FLORENCE–MARIE COOPER, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the operative First Amended Petition, all the records and files herein, along with the Report and Recommendation of the United States Magistrate Judge. Objections to the Report and Recommendation have been filed herein. Having made a *de novo* determination of those portions of the Report and Recommendation to which objections have been made, the Court concurs with and adopts the findings, conclusions and recommendations of the Magistrate Judge.

IT THEREFORE IS ORDERED that Judgment be entered denying the First Amended Petition and dismissing this action with prejudice.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

ROBERT N. BLOCK, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Florence–Marie Cooper, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

## PROCEEDINGS

On April 20, 2006, petitioner filed a Petition for Writ of Habeas Corpus by a Person in State Custody herein. The case was assigned to Magistrate Judge Jennifer Lum, who issued an Order Dismissing Petition with Leave to Amend on April 28, 2006. Petitioner then filed a First Amended Petition ("FAP") on May 22, 2006. In accordance with the Order Requiring Answer/Return to Petition, and following one extension of time, respondent filed an Answer to the FAP along with a supporting Memorandum of Points and Authorities ("Ans. Mem.") on August 9, 2006. In that Answer, respondent contended *inter alia* that Ground two (based on an alleged violation of *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)) of the FAP was unexhausted.

On October 16, 2006, by Order of the Chief Magistrate Judge, the case was reassigned to Magistrate Judge John Rayburn. On February 6, 2007, Magistrate Judge Rayburn issued a Minute Order requiring further briefing on Ground four (petitioner's sentencing error claim) in light of the Supreme Court's issuance of *Cunningham v. California*, 549 U.S. 270, 127 S.Ct. 856, 868, 166 L.Ed.2d 856 (2007). In a Supplemental Answer filed on March 7, 2005, respondent maintained that the sentencing error claim was procedurally defaulted, barred by the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), and in any event, any error was harmless. Although petitioner requested and was granted an extension of time to file a reply brief, he did not do so. On May 15, 2007, the Court issued an Order to Show Cause why the Court should not require further exhaustion of the sentencing error claim in light of *Cunningham.* Petitioner's subsequent request for an extension of time to file a reply brief was granted. Instead of filing a reply, however, petitioner filed a Motion to Stay Federal Proceedings so that he could return to State court to exhaust his *Cunningham* and *Faretta* claims. In an Order Re Further Exhaustion and Stay prepared by Judge Rayburn and issued by the District Court Judge, the matter was stayed so petitioner could return to State court to exhaust his *Cunningham* and *Faretta* claims.

At the direction of the Court, petitioner subsequently filed reports regarding the status of his habeas petition filed in the California Supreme Court. Then, on July 2, 2008, by Order of the Chief Magistrate Judge, the case was reassigned to this Court's calendar. On July 16, 2008, the Court issued an Order Re Further Proceedings wherein it observed that the California Supreme Court had denied petitioner's habeas petition on June 11, 2008. The Court ordered respondent to serve and file a Second Supplemental Answer addressing petitioner's second ground for relief (the *Faretta* claim) on the merits, and rebriefing the fourth ground for relief (the *Cunningham* claim) in light of the Ninth Circuit's recent decision in *Butler v. Curry*, 528 F.3d 624 (9th Cir.2008). Respondent filed the Second Supplemental Answer along with a supporting Memorandum of Points and Authorities ("Sec.Supp. Ans.Mem.") on September 12, 2008, following one extension of time. On October 23, 2008, petitioner filed a Reply to the original Answer ("Reply") and a Reply to the Second Supplemental Answer ("Supp.Reply").

Thus, this matter now is ready for decision. For the reasons discussed hereafter, the Court recommends that the FAP be denied.

## PROCEDURAL HISTORY

On December 16, 2003, a Los Angeles Court jury found petitioner guilty of evad-

ing a police officer, felon in possession of a firearm, and felon carrying a loaded firearm. (*See* Clerk's Transcript on Appeal ["CT"] 119–21; 3 Reporter's Transcript on Appeal ["RT"] 249–50). In a bifurcated proceeding, the jury also found true the sentence allegations that petitioner had suffered two prior convictions within the meaning of Cal.Penal Code § 12021(a) (1) and two prior serious or violent felony convictions within the meaning of Cal.Penal Code § § 1170.12(a)-(d), 667(b)-(i), and 667.5(b). (*See* CT 149; 3 RT 288–89). At a sentencing hearing held on January 6, 2003, the trial court struck one of petitioner's prior serious or violent felony convictions (i.e., a strike) by agreement of counsel, and then sentenced petitioner to an aggregate term of eight years four months in state prison. (*See* CT 177–78; 3 RT 297, 309–12).[1]

Petitioner appealed his conviction and sentence to the California Court of Appeal raising *inter alia* claims generally corresponding to the claims being alleged by him herein. In an unpublished decision filed on January 11, 2005, the California Court of Appeal rejected petitioner's claims and affirmed the judgment. (*See* Respondent's Notice of Lodging of Documents ["Lodged Doc."] Nos. 5, 6, 9). Petitioner's Petition for Rehearing filed on January 26, 2005 was denied by the California Court of Appeal in an Order Modifying Opinion and Denying Petition for Rehearing filed on February 8, 2005. (*See* Lodged Doc. Nos. 10, 11). Petitioner's ensuing Petition for Review to the Califor-

nia Supreme Court raising claims generally corresponding to the first, third, and fourth claims of the FAP was summarily denied on March 30, 2005 "without prejudice to any relief to which [petitioner] might be entitled after [the determination] in *People v. Black*, S126182 ... [of] the effect of *Blakely v. Washington* (2004) 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, on California law." (*See* Lodged Doc. Nos. 12, 13).

As noted, petitioner filed a habeas petition in the California Supreme Court to exhaust his second and fourth grounds for relief on December 8, 2007.[2] That petition was summarily denied without comment or citation of authority on June 11, 2008. (*See* Lodged Docs. B, C).

## SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

Since petitioner is not challenging the sufficiency of the evidence to support his conviction, the following summary is taken from the "Background" section of the California Court of Appeal opinion.

*On June 3, 2003, at approximately 3:40 a. m., Los Angeles County Deputy Sheriff Jason Biss was driving a marked patrol car south on Sierra Highway near Linda Vista when he observed [petitioner] driving a white Chevrolet sedan straddling the number one and two lanes. Deputy Biss followed [petitioner] for approximately one mile, and appellant accelerated his vehicle to approximately 60 to 70 miles*

---

1. This sentence was comprised of the upper term of three years doubled due to the prior strike on count one (evading a police officer), one-third the midterm for a total of one year four months on count two (felon in possession of a firearm), and one year for one prior prison term under § 667.5(b).

2. With respect to the sentencing error claim raised in the Court of Appeal that generally

corresponds to Ground four of the FAP, the claim raised in the California Court of Appeal was premised on *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). The claim raised in the habeas petition filed in the California Supreme Court was based also on *Cunningham*.

per hour. *[Petitioner] drove through a red light, nearly colliding with another vehicle, and Detective Biss turned on his siren and roof light and pursued [petitioner]. Deputy Biss saw [petitioner] run two more red lights, swerving between lanes and moving at a speed of approximately 60 to 90 miles per hour. [Petitioner] eventually drove up an embankment and crashed into a hillside. When Detective Biss drove up behind appellant's vehicle, [petitioner] put his vehicle in reverse, causing it to collide with Biss's patrol car. Two other deputies arrived and arrested [petitioner]. Deputy Cameron Drake found a loaded .38 semiautomatic handgun registered to Charles Moore in [petitioner's] car.*

*[Petitioner] testified that on the date of his arrest, he was driving on Sierra Highway and gave a ride to a man who was on foot. While in the car, the man asked [petitioner] where the man could obtain narcotics. [Petitioner] was on parole and did not want to have anything further to do with the man, so he pulled over and threw him out of the car. When [petitioner] continued driving, he noticed some clothing on the floor of the car that he assumed belonged to the man. [Petitioner] picked up the clothes and noticed a gun on the floor. [Petitioner] had never seen the gun before. [Petitioner] noticed a patrol car behind him but did not stop. [Petitioner] denied running any red lights or backing his car into Deputy Biss's car.* (Lodged Doc. A at 3–4).

## PETITIONER'S CLAIMS

1. The trial court abused its discretion by failing to conduct an on-the-record investigation into whether there was a manifest need to restrain petitioner during trial. (*See* FAP at ¶ 7a(1); Reply at 1–3).

2. The trial court committed reversible error by denying petitioner's request to represent himself and to appoint standby counsel. (*See* FAP at ¶ 7b(1); Supp. Reply at 2–4).

3. The conviction must be reversed because petitioner was denied his federal constitutional right to be present at the hearing where the court determined that he would be shackled. (*See* FAP at ¶ 7c(1); Reply at 3–4).

4. The trial court's imposition of the upper term and consecutive sentence violated petitioner's Sixth Amendment right to a jury trial. (*See* FAP at ¶ 7d(1); Supp. Reply at 4–9).

## STANDARD OF REVIEW

The standard of review applicable to petitioner's claims herein is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

■ Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see*

*also Carey v. Musladin,* 549 U.S. 70, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006); *Smith v. Patrick,* 508 F.3d 1256, 1260 (9th Cir.2007).

■■■ Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *See Williams,* 529 U.S. at 391, 413, 120 S.Ct. 1495. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *See Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam); *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *Williams,* 529 U.S. at 406, 120 S.Ct. 1495. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early,* 537 U.S. at 8, 123 S.Ct. 362.

■■■ State court decisions that are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early,* 537 U.S. at 11, 123 S.Ct. 362 (citing 28 U.S.C. § 2254(d) and adding emphasis). A state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *See Williams,* 529 U.S. at 406–10, 413, 120 S.Ct. 1495 (*e.g.,* the rejected decision may state *Strickland* rule correctly but apply it unreasonably); *Woodford v. Visciotti,* 537 U.S. 19, 24–27, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Visciotti,* 537 U.S. at 24–27, 123 S.Ct. 357; *Williams,* 529 U.S. at 413, 120 S.Ct. 1495. An "unreasonable application" is different from an erroneous or incorrect one. *See Williams,* 529 U.S. at 409–10, 120 S.Ct. 1495; see also *Visciotti,* 537 U.S. at 25, 123 S.Ct. 357; *Bell v. Cone,* 535 U.S. 685, 699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

## DISCUSSION

### A. Habeas relief is not warranted with respect to petitioner's Faretta claim.

Petitioner claims in Ground two of the FAP that the trial court committed reversible error by denying his request to represent himself or appoint standby counsel. (*See* FAP at ¶ 7b(1); Supp. Reply at 2–4).

#### 1. The record below

On October 9, 2003, the trial court entertained a *Marsden* motion by petitioner.[3] Petitioner addressed the trial court regarding a conviction he had sustained by guilty plea in 1995, which petitioner believed did not qualify as a strike. The trial court advised petitioner that he had the right to have the jury determine whether his prior convictions were strikes or not and that his counsel (Leslie Warren) would "raise the issues." (*See* Lodged Doc. D at A–5–A–6). Petitioner indicated that he be-

---

**3.** *People v. Marsden,* 2 Cal.3d 118, 122–24, 84 Cal.Rptr. 156, 465 P.2d 44 (1970) (allowing for a hearing into a defendant's motion for substitute counsel).

lieved there was a "potential conflict of interest" between himself and his counsel because he had provided her with information regarding the facts of this case and she had not investigated. When the trial court inquired of petitioner what he was asking the court to do, petitioner responded: "I am, basically, if it's possible that I could somehow be given—granted the right to have some type of a pro per with the assistance—[ ... ] assistance of counsel or something." The trial court stated, "No. [ ... ] No we don't do that. Either pro per or you are not. There is no pro per with the assistance of counsel." (*See* Lodged Doc. D at A–6–A–7). The trial court indicated that petitioner's counsel, not petitioner, "runs the case." Petitioner then stated, "You know, I'm asking either to either [sic] appoint a new counsel, or I don't know. You know what I mean?" (*See* Lodged Doc. D at A–8). When the trial court inquired what petitioner's counsel's response was, she indicated that she was investigating the case appropriately, that she had filed a successful 995 motion on count 1, and that there was no conflict of interest. She stated that she had given petitioner "some bad news" regarding a prior robbery conviction that would most likely be a valid strike but that she was "still going to pursue that and check the complete file." In response to the court's specific inquiry, she stated that she did not believe that there was "a total breakdown in [their] relationship." The trial court then denied petitioner's request to replace his counsel. (*See* Lodged Doc. D at A–8–A–9).

Next, on November 12, 2003, the trial court entertained petitioner's second *Marsden* motion. Petitioner advised the trial court that he was finding it "hard to establish any type of dialogue" with Ms. Warren and that she was attempting to persuade him that the plea bargain was the "only thing that is available." (*See* Lodged Doc. E at 9). Petitioner again referred to his belief that he did not have any strikes. Petitioner stated his opinion that the judicial system was "out to work [him]" since the court already had denied his motion to dismiss Ms. Warren and his motion to represent himself pro per. The trial court responded that petitioner had never made that motion. Petitioner responded that the last time he was in court, he had asked if Ms. Warren could be dismissed or if he could "go pro per, or go co-counsel." The trial court responded, "No. You never said anything about pro per." The court advised petitioner that it did not know whether the strikes were in fact strikes but that petitioner had been charged with two strikes. (*See* Lodged Doc. E at 10). Petitioner continued to dispute whether his prior convictions qualified as strikes, and he maintained that he had not been advised when pleading in a prior case that he would receive a strike. Petitioner continued discussing the prior strike and then stated: "I feel that I am being manipulated, you know, as far as the judicial system is concerned, because I am not really familiar, you know, with the law that good. I am not a paralegal. I didn't take the fucking bar exam." (*See* Lodged Doc. E at 11–12). The trial court advised petitioner not to "talk like that." Petitioner responded, "It's expression of speech. It's called frustration. It's already been what? I have been here, what, five mother fucking months [ ... ] six, seven months. And you guys ain't done shit." (*See* Lodged Doc. E at 12). The trial court advised petitioner that he was either going to be excluded from the courtroom or the court was "sure" the prosecutor had a roll of duct tape. Petitioner responded that the court's bias was evident and he was glad it was on the record. (*See* Lodged Doc. E at 12). After the court advised petitioner

he did not have a right to curse in the courtroom, petitioner continued to curse. The court ordered petitioner taken out of the courtroom. Apparently while on his way out, petitioner inquired, "I am asking you, so am I going to get, am I going to get my co-counsel or whatever it is that I got coming to me or what?" The court did not respond to petitioner but when his counsel inquired of the court's ruling, it stated that petitioner's request to replace Ms. Warren was denied. (*See* Lodged Doc. E at 13).

### 2. *The California Court of Appeal decision*

In rejecting petitioner's *Faretta* claim, the California Court of Appeal observed that a criminal defendant has two mutually exclusive constitutional rights—the right to be represented by counsel and the right to self-representation. The Court of Appeal found that here, petitioner had not made an unequivocal request to represent himself because his request had been conditioned upon the assistance of standby counsel. It further found that the trial court's response ("[W]e don't do that. Either pro per or you are not. There is no pro per with the assistance of counsel.") did not constitute an unequivocal denial of petitioner's right to self-representation because it complied with the applicable law in that there is no constitutional right to standby counsel. Finally, it found that, although a trial court does have discretion to appoint advisory counsel to assist a defendant exercising the right of self-representation, the need to exercise such discretion did not arise here because petitioner did not make an unequivocal request to represent himself. (*See* Lodged Doc. No. 9 at 7–8).[4]

### 3. *Analysis*

 As the Court of Appeal observed, a criminal defendant has a Sixth Amendment right to be represented by counsel or to represent himself. *See Faretta*, 422 U.S. at 832, 95 S.Ct. 2525. However, a criminal defendant's request to represent himself must be "unequivocal, timely, and not for purposes of delay." *See Stenson v. Lambert*, 504 F.3d 873, 883 (9th Cir.2007), *cert. denied,* — U.S. —, 129 S.Ct. 247, 172 L.Ed.2d 188 (2008). The issue of whether a criminal defendant's request to represent himself was unequivocal is a finding of fact that is entitled to deference and is presumed correct under 28 U.S.C. § 2254(e)(1). *See id.* at 882.

 Here, the California Court of Appeal found that petitioner's request to represent himself at the October 9th hearing was not unequivocal because it was conditioned upon the assistance of standby counsel. (*See* Lodged Doc. 9 at 7). Petitioner has made no showing to rebut the presumption of correctness that attaches to this finding under § 2254(e)(1). Further, the Court finds that this determination by the Court of Appeal was not based on an unreasonable determination of the facts. Initially, petitioner stated that he wanted to go "in pro per with the assistance—assistance of counsel or something." (*See* Lodged Doc. E at A–7). Later in the proceeding, petitioner requested that the trial court "either appoint new counsel, or I don't know." (*See* Lodged Doc. E at A–8). Neither the quoted statement nor the quoted request amounted to an unequivocal request by petitioner to represent himself. *See Stenson*, 504 F.3d

---

4. Under *Ylst v. Nunnemaker,* 501 U.S. 797, 803–04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), it may be presumed that the California Supreme Court, by its silent denial of petition-er's habeas petition raising the same claim, did not intend to change the California Court of Appeal's reasoned decision rejecting it.

at 883 (a clear preference for receiving new counsel over representing oneself may, in light of the record as a whole, show that the request for self-representation is equivocal); *see also United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994) (denying request for self-representation based on defendant's indication that he wanted "advisory" counsel). In addition, although the Court of Appeal did not consider the record of the November 12th hearing, the trial court accurately recalled the proceedings from October 9th when it found that petitioner had made no request to "go pro per" at that earlier hearing. Nor did petitioner make a request for self-representation at the November 12th proceeding. Instead, apparently as he was being escorted out of the courtroom due to his inappropriate behavior, he again inquired whether he would get his "co-counsel." (*See* Lodged Doc. E at 13). Because petitioner's request to represent himself, to the extent there even was such a request, was equivocal, the Court has no basis for finding or concluding that the State court's rejection of petitioner's claim either was contrary to or involved an unreasonable application of *Faretta*.

■ With respect to the part of Ground two directed to the trial court's denial of petitioner's request for standby counsel, the Court notes that the Supreme Court has never held that a criminal defendant has a constitutional right to standby or advisory counsel. In fact, Ninth Circuit authority on the issue suggests just the opposite. *See Kienenberger*, 13 F.3d at 1356 ("A defendant does not have a constitutional right to 'hybrid' representation"); *Locks v. Sumner*, 703 F.2d 403, 408 (9th Cir.) ("If the right to co-counsel is not of constitutional dimension ... we fail to see why the right to advisory counsel should be afforded higher status. The decision to allow a defendant to proceed with either form of hybrid representation is best left to the sound discretion of the trial judge.") (internal citation omitted), *cert. denied*, 464 U.S. 933, 104 S.Ct. 338, 78 L.Ed.2d 307 (1983). Consequently, the State courts' rejection of this part of petitioner's claim cannot be found to have been contrary to or an unreasonable application of clearly established Supreme Court law. *See Wright v. Van Patten*, 552 U.S. 120, 128 S.Ct. 743, 746–47, 169 L.Ed.2d 583 (2008) (per curiam) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law." (internal quotation marks omitted)); *Musladin*, 127 S.Ct. at 654 ("Given the lack of holdings from this Court regarding" the claim, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" (alterations in original)); *Moses v. Payne*, 543 F.3d 1090, 1098 (9th Cir. 2008) ("Where no decision of the Supreme Court 'squarely addresses' an issue ... a state court's adjudication of that issue cannot result in a decision contrary to, or an unreasonable application of, Supreme Court precedent.") (internal citation omitted); *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir.) ("If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law."), *cert. denied*, 543 U.S. 1037, 125 S.Ct. 814, 160 L.Ed.2d 602 (2004).

**B. *Habeas relief is not warranted with respect to petitioner's claims relating to his shackling at trial.***

1. *The record below*

At a hearing held before trial, the trial court indicated that it had spoken with

defense counsel the day before and understood there was a matter that counsel wanted to put on the record "preferably without [her] client present." (*See* 2 RT 1). The trial court indicated that it had not met petitioner but had reviewed the pre-plea report and noted a statement from the probation department that petitioner had had some psychological problems. (*See* 2 RT 1–2). Defense counsel stated:

> "[A]s this case has been going along, he's been getting progressively hostile and argumentative when I'm in the interview room with him and also when he's in court. [¶] At one point in time he had become so disrespectful to Judge Peven and despite Judge Peven's warnings continued in a very verbally hostile, aggressive manner. [¶] It was during a *Marsden* motion, that he had to—the proceedings had to be stopped and he had to be removed. [¶] Sometimes when I talk to him in the interview room he stands up, he slams his hand or fist down on the counter and/or hits the glass. [¶] I don't know that it's necessarily directed at me. I think it's a lot of frustration on his part, fear, anger, all sort of emotions; but he's having difficulty controlling them, and I feel a little concerned for my safety since I'm sitting here because I would be potentially the person he could lash out at. [¶] So I've never done this before; but his actions are not just an isolated incident, but something that's been continuing and actually getting more hostile and aggressive that I would feel more comfortable during the trial if he were restrained in some way; and I would prefer to do it in some way that's not so noticeable to the court unless and until he does something more that might necessitate it." (2 RT 2–3).

The trial court responded that it would "obviously" be aware of any restraints, so it assumed counsel was primarily concerned about the jury. Defense counsel responded, "[t]hat's what I mean. That's why I suggested if there is some way we can do something to keep him somewhat restrained during the trial that was not necessarily overly obvious to the jury." Defense counsel understood that there was some "sort of restraining seat." (*See* 2 RT 3). The trial court indicated that in light of the brief conversation the preceding day, it had inquired of the deputy whether they had such a chair. The deputy had indicated that such a chair was available. The trial court then stated:

> "[O]n what you have represented to the court, Ms. Warren, and agreeing that your well-being should not be subject to even the psychological pressure on you going into trial, that you might have to fend off any kind of an incident concerning him, I think that it is in the best interest of all concerned that we use that chair this time if I'm understanding that is what you are requesting of the court." (2 RT 3–4).

Defense counsel confirmed that that was what she was requesting. The trial court responded:

> "As I've said, I've never met your client; and so I've had no familiarity with the matters that you have just discussed with me, nor have I heard from Judge Peven anything at all concerning the case or his experiences. [¶] That's what we'll do then. We will put him in that; and if it's all right with you, Ms. Warren, may I speak with him directly about what's appropriate conduct in the courtroom?" (2 RT 4).

Defense counsel agreed. (*See* 2 RT 4). Subsequently, the trial court assured petitioner that it would do everything it could to get a fair and impartial jury and to conduct the trial fairly and impartially. It

indicated that it hoped petitioner was comfortable "here" and advised him that his "conduct and attitude will have a tremendous effect also on just the atmosphere in the courtroom." The court urged petitioner to maintain an appropriate attitude toward the jury and advised him that disruptive or discourteous behavior would not stop the trial but would be a "disadvantage" to petitioner and his counsel. (*See* 2 RT 9).

Following the trial, petitioner requested that his counsel submit a document to the trial court, which the trial court characterized as a "set of grievances." Among petitioner's complaints was his concern that some juror or alternate saw him in restraints. (*See* 3 RT 293–94). The trial court stated:

> "The bailiff advised me following that circumstance that he had been removed from restraints when that incident occurred; and so I do not believe that anybody saw [petitioner] in restraints. [¶] That's my personal belief; and again it's simply my personal belief." (3 RT 294).

2. *Petitioner's claim that the trial court abused its discretion in failing to find a manifest need to shackle petitioner*

Petitioner claims in Ground one of the FAP that the trial court abused its discretion by failing to conduct an on-the-record investigation into whether there was a manifest need to restrain petitioner during trial. (*See* FAP at ¶ 7a(1); Reply at 1–2).

a. *The California Court of Appeal decision*

In rejecting this claim on direct review, the California Court of Appeal reasoned, in pertinent part:

> The record does not disclose the type of restraint that was used on [petition-

er] at trial, nor does it contain any objection by [petitioner] at trial concerning the use of restraints. After the jury had found [petitioner] guilty of the offenses charged, and before [petitioner] was sentenced, [petitioner] submitted to the trial court a list of grievances concerning the conduct of the trial. Among these grievances was an allegation that a juror had seen [petitioner] in restraints. The trial court responded that it had spoken with the bailiff concerning the alleged incident; that the bailiff had advised the court that [petitioner] had been removed from restraints when the incident occurred; and that the court did not believe any juror had seen [petitioner] in restraints.

> A defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.... 'Manifest need' arises only upon a showing of unruliness, an announced intention to escape, or evidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained .... Moreover, the showing of nonconforming behavior ... must appear as a matter of record .... In determining whether restraints are necessary, a trial court is obligated to base its determination on facts, not rumor and innuendo even if supplied by the defendant's own attorney.... A trial court's decision regarding the use of restraints will not be overturned except on a showing of manifest abuse of discretion....

> A trial court's decision concerning the use of physical restraints cannot be challenged for the first time on appeal.... [Petitioner] did not object to the use of restraints during the trial. Admittedly, as his counsel had request-

ed the restraint in an in camera proceeding, the [petitioner] may have had no meaningful opportunity to object on his own, unless he did so in open court in front of the jury. But if he did object, his counsel should have conveyed to the court the objection. Even assuming the objection was not forfeited, the record here contains a showing of manifest need for the use of restraints at trial. Defense counsel provided specific examples of [petitioner's] nonconforming behavior, including his aggressive behavior during a pre-trial proceeding and in the interview room. Based on defense counsel's representations, the trial court made its determination that restraints were necessary. There was no abuse of discretion in this regard. Moreover, there is substantial evidence that the restraints were concealed from the jury's view. (Lodged Doc. No. 9 at 9–10) (internal quotations and citations omitted).

In its Order Modifying Opinion and Denying Petition for Rehearing, the California Court of Appeal added a citation to and discussion of *Castillo v. Stainer*, 983 F.2d 145, 147 (9th Cir.1992):

Federal courts in California apply a similar 'compelling circumstances' standard for determining whether a trial court's decision to restrain a defendant violates federal due process rights. (Castillo v. Stainer (1992) 983 F.2d 145, 147.) Under the federal standard, a state trial court must assess the 'limitations' presented by the use of shackles, including reversal of the presumption of innocence, impairment of the defendant's mental ability, impeding communication between the defendant and his counsel, and detraction from the decorum of the trial, and pain. (Ibid.) " 'After considering these factors, the trial judge 'must weigh the benefit and burdens of shackling against other possible

alternatives.' " [ . . . ] Under the standard applied by the Ninth Circuit, '[I]f a state trial court, without complying with the criteria set by this court, orders shackling of such a character that it denies the defendant of due process of law ... [t]he error then is of constitutional magnitude' (Castillo v. Stainer, supra, 983 F.2d at p. 147) requiring the state to prove beyond a reasonable doubt that the error did not contribute to the ensuing verdict. (Chapman v. California (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705]; Castillo v. Stainer, supra, 983 F.2d at p. 149.) The record shows that the trial court considered some, although not all, of the criteria prescribed by the Ninth Circuit concerning the use of restraints, including the orderly conduct of the trial; defense counsel's ability to represent [petitioner] effectively during the trial without fear of fending off a potential incident; and whether restraints would be visible to the jury. Based on the record before us, we conclude that the trial court's decision to restrain [petitioner] did not deny him his due process rights. (Lodged Doc. No. 10).

b. *This claim is not procedurally defaulted.*

■■■ Respondent contends that petitioner's claim challenging the trial court's decision to shackle him without making a finding of manifest necessity is procedurally barred based on petitioner's failure to object at trial. (*See* Ans. Mem. at 15–18).

■■■ Under California law, the failure to interpose a specific and timely objection in the trial court on the ground advanced on review independently serves as a procedural bar to consideration of the issue by the appellate courts. *See, e.g.,* Cal. Evid. Code § 353; *People v. Alvarez*, 14 Cal.4th

918

155, 186, 58 Cal.Rptr.2d 385, 926 P.2d 365 (1996), *cert. denied,* 522 U.S. 829, 118 S.Ct. 94, 139 L.Ed.2d 50 (1997); *People v. Champion,* 9 Cal.4th 879, 918–19, 39 Cal. Rptr.2d 547, 891 P.2d 93 (1995), *cert. denied,* 516 U.S. 1049, 116 S.Ct. 714, 133 L.Ed.2d 668 (1996); *People v. Johnson,* 6 Cal.4th 1, 51, 23 Cal.Rptr.2d 593, 859 P.2d 673 (1993), *cert. denied,* 513 U.S. 844, 115 S.Ct. 133, 130 L.Ed.2d 76 (1994); *People v. Morris,* 53 Cal.3d 152, 187–88, 279 Cal. Rptr. 720, 807 P.2d 949 (1991), *cert. denied,* 502 U.S. 959, 112 S.Ct. 421, 116 L.Ed.2d 441 (1991).

■■■ However, in order for a claim to be procedurally defaulted for federal habeas corpus purposes, the opinion of the last state court rendering a judgment in the case must clearly and expressly state that its judgment rests on a state procedural bar. *Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *see also Coleman v. Thompson,* 501 U.S. 722, 729–30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Thomas v. Goldsmith,* 979 F.2d 746, 749 (9th Cir.1992).

Here, respondent contends that the California Court of Appeal "clearly and expressly" invoked the foregoing procedural bar when it stated the following in its decision before proceeding to reject petitioner's shackling claim on the merits:

> A trial court's decision concerning the use of physical restraints cannot be challenged for the first time on appeal.... [Petitioner] did not object to the use of restraints during the trial. Admittedly, as his counsel had requested the restraint in an in camera proceeding, the [petitioner] may have had no meaningful opportunity to object on his own, unless he did so in open court in front of the jury. But if he did object, his counsel should have conveyed to the court the objection. (*See* Ans. Mem. at 17).

Given the particular circumstances, which the Court of Appeal acknowledged, this Court is not prepared to find that the foregoing passage from the Court of Appeal opinion constituted a "clear and express" invocation of the contemporaneous objection rule. Like the Court of Appeal, the Court will therefore now turn to the merits of petitioner's claim.

c. *Petitioner's claim challenging the shackling fails on the merits.*

■■■ Initially, the Court notes that, to the extent petitioner purports to be challenging the trial court's failure to make a finding of "manifest necessity" to shackle him, such a requirement exists only under California law. *See, e.g., People v. Mar,* 28 Cal.4th 1201, 1216, 124 Cal.Rptr.2d 161, 52 P.3d 95 (2002); *People v. Seaton,* 26 Cal.4th 598, 651, 110 Cal.Rptr.2d 441, 28 P.3d 175 (2001), *cert. denied,* 535 U.S. 1036, 122 S.Ct. 1794, 152 L.Ed.2d 652 (2002); *Tiffany A. v. Superior Court,* 150 Cal.App.4th 1344, 1357, 59 Cal.Rptr.3d 363 (Cal.App.Ct.2007). Because federal habeas relief only is available if the petitioner is contending that he is in custody in violation of the Constitution or laws or treaties of the United States, *see* 28 U.S.C. § 2254(a); *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ("A federally issued writ of habeas corpus, of course, reaches only convictions obtained in violation of some provision of the United States Constitution."), this aspect of petitioner's claim is not cognizable in this Court. However, to the extent petitioner is challenging the trial court's decision to shackle him under the Federal constitution (*see*

FAP at ¶ 7a(1) (citing "*Illinois v. Allen*")), his claim is cognizable.

 In *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), the Supreme Court observed that "no person should be tried while shackled and gagged except as a last resort" because of the distinct possibility of "a significant effect on the jury's feelings about the defendant." Subsequently, the Supreme Court held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri,* 544 U.S. 622, 629, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005); *see also Holbrook v. Flynn,* 475 U.S. 560, 568–69, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). "Therefore, due process requires the trial court to engage in an analysis of the security risks posed by the defendant and to consider less restrictive alternatives before permitting a defendant to be restrained" during trial. *Rhoden v. Rowland,* 172 F.3d 633, 636 (9th Cir.1999); *see also Duckett v. Godinez,* 67 F.3d 734, 748 (9th Cir.1995), *cert. denied,* 517 U.S. 1158, 116 S.Ct. 1549, 134 L.Ed.2d 651 (1996).[5] The trial court is "not required to state on the record all its reasons for imposing shackles, nor must it conduct an evidentiary hearing on the issue of necessity before ordering the use of physical restraints" but "the basis for the decision to shackle should be apparent from the record." *See Duckett,* 67 F.3d at 749 n. 7. More recently, in *Ghent v. Woodford,* 279 F.3d 1121, 1132 (9th Cir.2002) (as amended), the Ninth Circuit held that in order for a

defendant to prevail on a due process challenge to shackling in front of the jury,

"a court must find that the defendant was indeed physically restrained in the presence of the jury, that the shackling was seen by the jury, and that the physical restraint was not justified by state interests. Then, in order for the unjustified shackling to rise to the level of a constitutional error, the defendant must make a showing that he suffered prejudice as a result." *Id.* at 1132 (citing the *Brecht v. Abrahamson* standard for harmless error).

Here, the basis for the use of physical restraints against petitioner is apparent from the record. As set forth above, defense counsel advised the trial court of petitioner's escalating hostility and aggression toward her and his hostile behavior in Judge Peven's courtroom. According to defense counsel, petitioner's actions were not "just an isolated incident, but something that's been continuing;" he had to be removed from the proceedings during the *Marsden* motion due to his behavior; and he was only getting "more hostile and aggressive." (*See* 1 RT 2–3). The trial court indicated that although it had not met petitioner, it was important that defense counsel not be subjected to the psychological pressure of going to trial worried about fending off an attack from her client, it acknowledged counsel's concern that the jury not see the restraints, and it concluded that it was best for all concerned that the restraint chair be used. (*See* 2 RT 3–4). The Court has no basis for finding that the trial court's decision to shackle petitioner under the circumstances

---

5. In *Castillo,* 983 F.2d at 148, amended by 997 F.2d 669 (1993), cited by the California Court of Appeal, the Ninth Circuit found that with respect to the pursuit of less restrictive alternative measures, the trial court must assess the "limitations" present if shackles are

applied, including "(1) reversal of the presumption of innocence, (2) impairment of the defendant's mental ability, (3) impeding of communication between the defendant and his counsel, (4) detraction from the decorum of the trial, and (5) pain."

presented was not "justified by state interests." *See Ghent,* 279 F.3d at 1132. Although the trial court did not engage in any on-the-record analysis of less restrictive alternatives, petitioner has not established that the jury even saw the shackling. Petitioner alleged in his list of grievances following trial that the jury had seen him in the shackles but the trial court indicated that it had spoken with the deputy regarding the incident and was satisfied that the jury had not seen petitioner in shackles. Petitioner has adduced no competent evidence to the contrary. *See Rich v. Calderon,* 187 F.3d 1064, 1069 (9th Cir.1999) ("where care is taken to ensure that a defendant's shackling is not visible to the jury in the courtroom, no error results").

Accordingly, the Court finds and concludes that the State courts' rejection of the shackling claim alleged in Ground one of the FAP neither was contrary to nor involved an unreasonable application of clearly established Supreme Court law.

### 3. *Petitioner's claim that he was not present at the hearing regarding the use of shackles*

Petitioner claims in Ground three of the FAP that his conviction must be reversed because he was denied his federal constitutional right to be present at the hearing where the court determined that he would be shackled. (*See* FAP at ¶ 7c(1); Reply at 3–4).

#### a. *The California Court of Appeal decision*

In rejecting this claim on direct review, the California Court of Appeal reasoned petitioner's absence from the courtroom when the trial court made the decision to restrain him was not a violation of his federal constitutional right to be present at trial because (a) the decision was not made during trial, but in a pre-trial proceeding, and (b) petitioner's "presence during this informal, pre-trial proceeding did not 'bear[ ] a reasonably substantial relation to the fullness of his opportunity to defendant against the charge' and therefore was not constitutionally mandated." (Lodged Doc. No. 9 at 11). The Court of Appeal further found that any error was harmless:

> *As noted, [petitioner] did not communicate any objection he may have had to the use of restraints during trial. The court concluded that no juror had seen any restraints. Thus, there was no prejudice to [petitioner] by his having been shackled, notwithstanding that he was absent at the pretrial proceeding when the decision was made. (Id.* (citations omitted)).

#### b. *Analysis*

The Supreme Court has held that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer,* 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987); *see also United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) ("a defendant has a due process right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'"); *Faretta v. California,* 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (A defendant "has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings."). However, the Supreme Court has emphasized that "this privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a shadow.'" *See Stincer,* 482 U.S. at 745, 107 S.Ct. 2658 (quoting from

*Snyder v. Massachusetts,* 291 U.S. 97, 106–07, 54 S.Ct. 330, 78 L.Ed. 674 (1934)).

■■■ Here, petitioner has made no showing that his presence at the hearing "would have been useful in ensuring a more reliable determination as to whether" he ought to have been shackled at trial. *Stincer,* 482 U.S. at 747, 107 S.Ct. 2658. Although petitioner would, by his presence, have had the opportunity to counter his own counsel's statements, he has not alleged that he had any basis for doing so. Petitioner does not contend, for example, that his counsel misrepresented the record in advising the trial court of petitioner's obstreperous behavior in front of Judge Peven [6] or that his counsel misrepresented petitioner's conduct in her own exchanges with him. Moreover, the Supreme Court has cautioned that "the exclusion of a defendant from a trial proceeding should be considered in light of the whole record." *Gagnon,* 470 U.S. at 526–27, 105 S.Ct. 1482. Here, the proceeding at which the trial judge ruled that petitioner would be shackled occurred before the trial, outside the presence of the jury. Petitioner's presence "was not required to ensure fundamental fairness or a 'reasonably substantial ... opportunity to defend against the charge.'" *Id.* at 527, 105 S.Ct. 1482 (finding that ex parte communication between judge, juror, and defense counsel was not a critical stage of the proceeding). Because the benefit of his presence would have been "but a shadow," *id.* at 745, 105 S.Ct. 1482, and because the proceeding did not affect petitioner's ability to defend against the charges, the Court has no basis for finding or concluding that petitioner's absence at the proceeding violated his constitutional right to due process.

Moreover, the California Court of Appeal's usage of harmless error analysis in rejecting this claim was not contrary to clearly established Supreme Court law. *See Rushen v. Spain,* 464 U.S. 114, 119 n. 2, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) ("the right to be present during all critical stages of the proceedings [ ... ] as with most constitutional rights, [is] subject to harmless-error analysis [ ... ] unless the deprivation, by its very nature, cannot be harmless.") (internal citations omitted); *see also Campbell v. Rice,* 408 F.3d 1166, 1172 (9th Cir.) ("The Supreme Court has never held that the exclusion of a defendant from a critical stage of his criminal proceedings constitutes a structural error"), *cert. denied,* 546 U.S. 1036, 126 S.Ct. 735, 163 L.Ed.2d 578 (2005). Thus, even assuming petitioner's absence from the proceeding where the trial court decided to have petitioner shackled during trial violated his constitutional rights to be present as a matter of clearly established Supreme Court law, petitioner still would not be entitled to habeas relief unless the California Court of Appeal "applied harmless error review in an 'objectively unreasonable' manner." *See Mitchell v. Esparza,* 540 U.S. 12, 18, 124 S.Ct. 7, 12, 157 L.Ed.2d 263 (2003); *see also Campbell,* 408 F.3d at 1173 (applying *Esparza* to state court's harmless error analysis of claim challenge petitioner's absence from trial proceeding). The Court finds and concludes that it did not for the same reasons stated by the Court of Appeal. Petitioner did not communicate any objection he may have had to the use of the restraints during the trial (e.g., that it impaired his mental ability, inflicted pain, or impeded communication

---

6. In this regard, the transcript of the hearing held on November 12, 2003, set forth in the Court's analysis of petitioner's *Faretta* claim above, substantiates that petitioner's conduct at the second *Marsden* hearing before Judge

Peven was inappropriate and that the judge did have him removed from the proceeding after he failed to heed the court's warnings to control himself and his cursing. (*See* Lodged Doc. E at 12–13).

with his counsel). Nor has he made any such showing. Further, the trial court concluded that no juror had seen any restraints. And, as noted above, petitioner has adduced no competent evidence to the contrary. *See Castillo*, 983 F.2d at 149 (shackling error harmless where restraint was unseen by the jury and there was no showing that the shackling impaired the petitioner's mental ability, inflicted pain, or impeded communication with counsel).

## C. *Habeas relief is not warranted with respect to petitioner's sentencing error claim(s).*

In *Apprendi*, 530 U.S. at 468, 120 S.Ct. 2348, the Supreme Court considered "whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt." Defendant Charles Apprendi had pled guilty to two counts of second-degree possession of a firearm for an unlawful purpose (Counts 3 and 18) and one count of third-degree unlawful possession of an antipersonnel bomb (Count 22) after he fired several bullets into the home of an African–American family who had recently moved into a previously all-white neighborhood. *See id.* at 469, 120 S.Ct. 2348. Following a hearing on the matter, the trial judge found by a preponderance of the evidence that the crime had been motivated by racial bias, and applying the state's hate crime statute, imposed a sentence of 12 years on Count 18. The maximum term for that "second degree offense" was 10 years, although a separate statute described as a "hate crime" law provided for an extended term of up to 20 years where the trial judge found by a preponderance of the evidence that the crime was committed with a purpose to intimidate an individual or group because

of race, color, gender, handicap, religion, sexual orientation, or ethnicity. *See id.* at 468–69, 120 S.Ct. 2348. The Supreme Court recognized that it had "often noted that judges in this country have long exercised discretion ... in imposing sentence *within statutory limits* in the individual case" based on a consideration of factors relating both to the offense and the offender. *See id.* at 481, 120 S.Ct. 2348 (italics in original). However, the New Jersey statute authorized punishment beyond the statutory maximum based on a finding made by the judge by a preponderance of the evidence. The Supreme Court found the statute unconstitutional and held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *See id.* at 490–92, 120 S.Ct. 2348. In other words, the Court found, " '[i]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.' " *See id.* at 490, 120 S.Ct. 2348.

█ In *Blakely*, 542 U.S. at 298, 124 S.Ct. 2531, the defendant pled guilty to kidnaping his estranged wife. The facts admitted in the plea, by themselves, supported a maximum sentence of 53 months. However, the trial court imposed an "exceptional" sentence of 90 months after it determined that the defendant had acted with "deliberate cruelty." The defendant challenged the sentencing procedure on the grounds that it deprived him of his federal constitutional right to have a jury determine beyond a reasonable doubt all facts "legally essential" to his sentence. *See id.* at 301, 124 S.Ct. 2531. The state argued that *Apprendi* had not been violat-

ed because the "statutory maximum" was not the 53–month maximum specifically set forth in the kidnaping statute, but rather, the 10 year maximum for class B felonies generally (of which kidnaping was one). *See id.* at 303, 124 S.Ct. 2531. The Supreme Court rejected the state's argument, noting that the precedents make clear that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* Or, in other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *See id.* at 303–04, 124 S.Ct. 2531 (italics in original). The Supreme Court remanded for further proceedings.

Subsequently, in *United States v. Booker,* 543 U.S. 220, 227, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the Supreme Court considered whether application of the Federal Sentencing Guidelines in two separate cases violated the Sixth Amendment. Defendant Booker had been found guilty of possession with intent to distribute at least 50 grams of cocaine base (crack), which carried a sentence of 10 years to life in prison. Based on Booker's criminal history and the quantity of drugs found by the jury, the Sentencing Guidelines required the District Court Judge to select a "base" sentence of not more than 21 years, 10 months. However, at a post-trial sentencing proceeding, the judge found by a preponderance of the evidence other factors which mandated a sentence between 30 years and life. A 30–year sentence was subsequently imposed. In the second case, defendant Fanfare was convicted by a jury of conspiracy to distribute and to possess with intent to distribute at least 500 grams of cocaine. The maximum sentence based on the jury verdict alone was 6

1/2 years. The judge made additional findings which would have required an enhanced sentence of 15 or 16 years. However, as *Blakely* had been issued just days before, the District Court Judge concluded that he could not impose the higher sentence, and imposed a sentence "based solely upon the jury verdict in this case." *See id.* at 228–29, 125 S.Ct. 738. The Supreme Court reaffirmed its holding in *Apprendi,* found that "the Sixth Amendment as construed in *Blakely*" did apply to the Sentencing Guidelines, and invalidated two provisions of the Sentencing Reform Act of 1984, which provisions had had the effect of making the Guidelines mandatory. *See id.* at 226–27, 243–46, 258–65, 125 S.Ct. 738. Further, federal sentences on review would be subject to a review for reasonableness. *See id.* at 260–62, 125 S.Ct. 738.

Finally, in *Cunningham,* 127 S.Ct. at 868, the Supreme Court invalidated California's determinate sentencing scheme on the basis that it violated *Apprendi's* "bright-line rule," i.e., that "Except for a prior conviction, 'any fact that increases the penalty beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" The Supreme Court found that the middle term described in the California statutes constituted the relevant statutory maximum, and that because aggravating circumstances were found by a judge and not a jury, and need only be established by a preponderance of the evidence, the sentencing scheme violated *Apprendi. See id.* Further, the California Supreme Court's attempt to type the determinate sentencing scheme a "reasonableness constraint" in *People v. Black,* 35 Cal.4th at 1261, 29 Cal.Rptr.3d 740, 113 P.3d 534 (2005) did not save it—the reasonable requirement *Booker* anticipated in the federal system operated within the Sixth Amendment con-

straints, not as a substitute for them. *See id.* at 870, 127 S.Ct. 856.

### 1. *The record below*

As noted, the jury found petitioner guilty of three counts (evading police, possession of a firearm by a felon, and felon carrying a loaded firearm), and also found true the sentence enhancement allegations that petitioner had sustained two prior strike convictions and had served two prior prison terms. Prior to sentencing petitioner, with the agreement of both counsel, the trial court struck one of petitioner's prior strikes. (*See* 3 RT 296–97). Citing petitioner's juvenile history between 1989 and 1991, a strike in 1995 for a robbery, "guns alleged as to the defendant," and "matters that contain the inherent prospect of violence," the trial court imposed the high term of three years on count two multiplied by two because of the one prior strike. The trial court additionally imposed eight months (one-third of the midterm) multiplied by two (i.e., sixteen months), consecutive to the sentence imposed in count two.[7] The trial court imposed and stayed the midterm of two years on count four. Finally, the trial court imposed one year for one prior prison term under § 667.5(b). The total sentence imposed was eight years and four months. (*See* 3 RT 310–12). The trial

court observed that the agreement by the prosecutor to strike one of the strikes was "exceedingly compassionate" given the nature of the charge and the prosecutor's general policy on that kind of charge, and commented that petitioner was getting a "gift of [his] life." (*See* 3 RT 308).

### 2. *The Teague issue*

■■■■ Respondent has alleged that petitioner's challenge to his upper term sentence is barred by the non-retroactivity doctrine set forth in *Teague*. (*See* Sec. Supp. Ans. Mem. at 16–18).[8]

■■■■ In *Teague*, the Supreme Court held that, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *See Teague*, 489 U.S. at 310, 109 S.Ct. 1060. Under *Teague*, the new rule will be applied or announced in cases on collateral review only if it falls into one of two exceptions. *See id.* at 311–13, 109 S.Ct. 1060. To determine whether a habeas petitioner is entitled to the application of a particular rule, the habeas court performs a three-step analysis under *Teague*: (1) the date on which the defendant's conviction became final is determined; (2) the habeas court considers whether the rule is new;[9]

---

**7.** The trial court did not provide any reasons for imposing the consecutive sentence. It stated only:

> "As to count three, which is the second count that was before the jury, the 12021(a)(1) Penal Code, possession of a firearm, the mid term of one-third is required as it will be served consecutively. This is a consecutive and separate offense." (*See* 3 RT 311).

**8.** Where the state properly raises a *Teague* argument, the Court must address it before reaching the merits of the petitioner's claim. *See, e.g., Horn v. Banks,* 536 U.S. 266, 267, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) (per curiam); *Caspari v. Bohlen,* 510 U.S. 383,

389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994); *Butler,* 528 F.3d at 633; *Fields v. Brown,* 503 F.3d 755, 770 (9th Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1875, 170 L.Ed.2d 752 (2008).

**9.** A rule may be "new" either because the decision relied upon by the habeas petitioner itself announced a new rule after his conviction became final, or because the habeas petitioner seeks to apply a prior decision's "old rule" to a novel setting, such that relief would create a new rule by the extension of the precedent. *See Stringer v. Black,* 503 U.S. 222, 228, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992).

and (3) if the rule is new, the court determines whether the rule nonetheless falls within one of the two narrow exceptions to the *Teague* doctrine. *See O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997). "In general … a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague*, 489 U.S. at 301, 109 S.Ct. 1060. Put another way, "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *See id.*

Here, respondent contends that the application of *Cunningham* to petitioner's sentence would violate *Teague* because petitioner's conviction became final on June 21, 2005, and such a rule was not then dictated by the Supreme Court's prior precedent. (*See* Sec. Supp. Ans. Mem. at 17–18).[10] However, the Ninth Circuit recently rejected that very same argument in *Butler*, holding that *Cunningham* did not announce a new rule of constitutional law and could be applied retroactively on collateral review since "*Apprendi, Blakely*, and *Booker* made 'courts throughout the land' aware that sentencing schemes that raise the maximum possible term based on facts not found by a jury violate the consti-

tutional rights of defendants." *See Butler*, 528 F.3d at 639.[11] Since petitioner's judgment of conviction, like the petitioner's in *Butler*, became final subsequent to *Apprendi, Blakely*, and *Booker, Butler* also is dispositive of respondent's contention that the application of *Cunningham* to petitioner's sentence would violate *Teague*.

Respondent further argues that application of the foregoing rule to California's consecutive sentencing scheme would violate *Teague* because "none of the Supreme Court's decisions before (or for that matter after) June 21, 2005, give any indication that the right to jury trial at sentencing concerns anything other than the statutory maximum for a crime, as opposed to some combined statutory maximum based on the aggregation of sentences on multiple crimes." (*See* Sec. Supp. Ans. Mem. at 18–19). However, if what respondent means by this assertion is that *Teague* would be violated by the application of the *Blakely* and *Apprendi* holdings to California's consecutive sentencing scheme because the *Blakely* and *Apprendi* cases themselves involved only the invalidation of upper term sentences, then it seems to the Court that *Butler* also is dispositive of that argument. There, the Ninth Circuit reiterated:

10. Although respondent does not elaborate on the argument, he also contends that granting relief under *Blakely* would violate *Teague*. (*See* Sec. Supp. Ans. Mem. at 16). The application of *Blakely* to petitioner's claim could not violate *Teague*, however, because *Blakely* was decided *before* petitioner's conviction became final.

11. Although the Ninth Circuit has granted a stay of the mandate in *Butler*, the panel decision remains the law of the Circuit. *See, e.g., Chambers v. United States*, 22 F.3d 939, 942 n. 3 (9th Cir.1994) ("We reject the government's argument that *[United States v.] X–Citement Video* [982 F.2d 1285 (9th Cir.1992)] is not binding precedent until the mandate issues in that case. In this circuit, once a published opinion is filed, it becomes the law of the

circuit until withdrawn or reversed by the Supreme Court or an en banc court."), *vacated on other grounds*, 47 F.3d 1015 (9th Cir. 1995); *United States v. Gomez–Lopez*, 62 F.3d 304, 306 (9th Cir.1995) ("The government first urges us to ignore *[United States v.] Armstrong* [48 F.3d 1508 (9th Cir.1995)] since we have stayed the mandate to allow filing of a petition for certiorari; this we will not do, as *Armstrong* is the law of this circuit."); *see also Yong v. I.N.S.*, 208 F.3d 1116, 1119 n. 2 (9th Cir.2000) (noting that "once a federal circuit court issues a decision, the district courts within that circuit are bound to follow it and have no authority to await a ruling by the Supreme Court before applying the circuit court's decision as binding authority").

"[W]hen a general rule must be applied in a new situation, it can hardly be thought to have created a new principle of constitutional law. In particular, in the context of applying rules of constitutional law to statutory schemes from different states, we have noted that applying existing constitutional rules to different state sentencing schemes d[oes] not implicate *Teague*." *Butler*, 528 F.3d at 634 (internal quotations and citations omitted).

For the foregoing reasons, the Court finds that petitioner's sentencing error claim is not barred by *Teague*.

### 3. *Petitioner's challenge to his upper term sentence*

### a. *The California Court of Appeal decision*

In rejecting petitioner's sentencing error claim directed at his upper term sentence, the California Court of Appeal reasoned that petitioner's sentence did not violate *Blakely* because it did not exceed the statutory maximum penalty the trial court could have imposed based on the jury's findings. The Court of Appeal noted in this regard that the jury had found that petitioner had suffered two prior serious felony convictions, and that the trial court had exercised its discretion to dismiss one of those conviction findings and sentenced petitioner as though the present conviction was a second, rather than a third, strike. "Thus, although the court could have sentenced [petitioner] to a 25-year to life term, the sentence imposed was less than that." The Court of Appeal further reasoned that, even if *Blakely* did apply, any error was harmless beyond a reasonable doubt because "[t]he jury in this case did find two of the three factors the trial court relied upon as the basis for imposing the upper term-[petitioner's] prior robbery conviction and [petitioner's] possession of a firearm in the current offense." (*See* Lodged Doc. No. 9 at 12–13).

### b. *Analysis*

■■ The Court concurs with the California Court of Appeal that *Blakely* did not apply here.

As noted, *Blakely* defined "statutory maximum" as "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* Or, in other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *See Blakely*, 542 U.S. at 303–04, 124 S.Ct. 2531 (italics in original) (internal citations omitted). *Blakely's* definition of the "statutory maximum" was based on the Supreme Court's language in *Apprendi*, 530 U.S. at 483, 120 S.Ct. 2348 and *Ring v. Arizona*, 536 U.S. 584, 602, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) that, "[a] defendant may not be exposed ... to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." Here, as the California Court of Appeal observed, the trial jury found that petitioner had suffered two prior convictions that qualified as strikes. Were the defendant punished according to the jury verdict, then, the trial court could have imposed a sentence of 25–years–to–life without making any additional findings. The relevant issue, then, is whether the trial court's act of striking one of petitioner's strikes resulted in a reduction of the "statutory maximum" to which petitioner was exposed—i.e., whether, for *Apprendi* purposes, petitioner's "statutory maximum" was no longer the 25–year–to–life term after the trial court struck one of the strikes, but rather was the mid-term sen-

tence subject only to doubling due to the prior strike that remained in tact.

Although the Court has not found any Supreme Court or Ninth Circuit case authority on point, *Harris v. United States,* 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), is instructive. There, the defendant had been charged *inter alia* with a drug trafficking violation under 18 U.S.C. § 924(c)(1), which provides in pertinent part:

"Any person who, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—(i) be sentenced to a term of imprisonment of not less than 5 years; (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years."

The indictment made no mention of the defendant having brandished a firearm. The District Court found by a preponderance of the evidence that the defendant had brandished a firearm and sentenced him to the 7–year–term. *See id.* at 550–52, 122 S.Ct. 2406. The Supreme Court rejected the defendant's Sixth Amendment challenge to the sentence, finding that " § 924(c)(1)(A) defines a single offense" and that the statute "regards brandishing and discharging as sentencing factors to be found by the judge, not offense elements to be found by the jury." *See id.* at 556, 122 S.Ct. 2406. The Supreme Court distinguished *Apprendi* on the basis that the judicial fact-finding in *Apprendi* extended the sentence beyond that statutory maximum, while the judicial fact-finding in *Harris* did not affect the maximum sentence and instead only increased the mini-

mum sentence. The Supreme Court reasoned:

"Once the jury finds all those facts, *Apprendi* says that the defendant has been convicted of the crime; the Fifth and Sixth Amendments have been observed; and the Government has been authorized to impose any sentence below the maximum. That is why, as *Apprendi* noted, 'nothing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to the offense and offender—in imposing a judgment *within the range*' ... The judicial fact-finding does not 'expose a defendant to a punishment greater than that otherwise legally prescribed.' [ ... ] The Fifth and Sixth Amendments ensure that the defendant 'will never get *more* punishment than he bargained for when he did the crime,' but they do not promise that he will receive 'anything less' than that. If ... the trial jury has found[ ] all the facts necessary to impose the maximum, the barriers between the government and defendant fall. The judge may select any sentence within the range, based on facts not alleged in the indictment or proved to the jury— even if those facts are specified by the legislature, and even if they persuade the judge to choose a much higher sentence than he or she otherwise would have imposed." *Harris,* 536 U.S. at 565–66, 122 S.Ct. 2406.

*See also United States v. Dare,* 425 F.3d 634 (9th Cir.2005) (post-*Booker* case relying on *Harris* to reject challenge to 10–year sentence under § 924(c) after judicial fact-finding regarding defendant having discharged a firearm); *United States v. Lopez,* 477 F.3d 1110 (9th Cir.2007) (finding that *Harris* and *Dare* foreclosed Sixth Amendment challenge to imposition of

mandatory minimum sentence under § 924(c)).

The Supreme Court's definition of "statutory maximum" in *Ring, Apprendi,* and *Blakely* as that sentence authorized by the jury verdict absent any additional fact-finding, coupled with the Supreme Court's finding in *Harris* that "[once] the trial jury has found[ ] all the facts necessary to impose the maximum, the barriers between the government and defendant fall" compels this Court to conclude that the fact that the trial court exercised its discretion to strike one of petitioner's strikes did not reduce the "statutory maximum" for *Apprendi* purposes. The Supreme Court observed in *Cunningham,* 127 S.Ct. at 873–74, citing *Harris,* that "when a trial court makes a fully discretionary sentencing decision ... the Sixth Amendment permits the court to base the sentence on its own factual findings." Here, once the trial court exercised its discretion to depart downward from the potential life-term by striking one of petitioner's prior strikes, the court retained discretionary authority to impose a sentence less than that maximum based on its own findings without violating petitioner's Sixth Amendment rights. Because petitioner's sentence, even with the upper term on count two, still was below the statutory maximum of 25–years–to–life, *Apprendi* and its progeny were not violated. The Court therefore finds and concludes that the State courts' rejection of petitioner's sentencing error claim directed to his upper term sentence neither was contrary to nor involved an unreasonable application of the aforementioned clearly established Supreme Court law.

Alternatively, the Court finds that, since the Supreme Court has never held in its Sixth Amendment jurisprudence that the statutory maximum for purposes of *Apprendi* and its progeny is the sentence to

which the defendant is exposed *after* a trial court exercises its discretion to strike a prior conviction sentencing enhancement found by the jury to be true, the Court has no basis for finding or concluding that the State court's rejection of petitioner's claim directed to his upper term sentence either was contrary to or involved an unreasonable application of clearly established Supreme Court law.

4. *Petitioner's challenge to the consecutive sentences*

a. *The California Court of Appeal decision*

In rejecting petitioner's sentencing error claim directed to his consecutive sentences, the California Court of Appeal reasoned that neither *Blakely* nor *Apprendi* addressed consecutive sentencing. The Court of Appeal adopted the reasoning of another Court of Appeal decision, which had held that *Blakely* did not apply to consecutive sentences. (*See* Lodged Doc. No. 9 at 13–16).

b. *Analysis*

■ At the time of petitioner's sentence, California law required that, whenever a person was convicted of two or more crimes, the judge direct whether the terms of imprisonment for the offenses were to run concurrently or consecutively and that the judge state on the record "the primary factor or factors that support the exercise of discretion" if the judge directed the terms of imprisonment to run consecutively. *See* Cal.Penal Code §§ 669, 1170(c); Cal. R. Ct. 4.406(a)-(b). However, in *People v. Black,* 35 Cal.4th 1238, 29 Cal.Rptr.3d 740, 113 P.3d 534 (2005) [hereinafter *"Black (I)"*], the California Supreme Court rejected petitioner's contention that *Blakely* entitled him to a jury trial on any facts that support the trial court's decision to impose consecutive

terms. It concluded that "the same reasoning that leads us to conclude that a jury trial is not required on the aggravating factors that justify imposition of the upper term leads us to conclude that a jury trial is not required on the aggravating factors that justify imposition of consecutive sentences." *See id.* at 1261, 29 Cal.Rptr.3d 740, 113 P.3d 534. It further reasoned that *Blakely's* underlying rationale was inapplicable to a trial court's decision whether to require that sentences on two or more offenses be served consecutively or concurrently:

> "The high court's decisions in *Blakely* and *Apprendi* are intended to protect the defendant's historical right to a jury trial on all elements of the crime, which the [Supreme Court] concluded would be jeopardized if a legislature could label facts affecting the length of the authorized sentence for an offense as sentencing factors rather than as elements and thereby eliminate the right to a jury trial on such facts. [¶] No such danger is created by a statute that permits judges to decide whether to impose consecutive sentences without jury factfinding. The jury's verdict finding the defendant guilty of two or more crimes authorizes the statutory maximum sentence for each offense. When a judge considers the circumstances of each offense and the defendant's criminal history in determining whether the sentences are to be served concurrently or consecutively, he or she cannot be said to have usurped the jury's historical role. Permitting a judge to make any factual findings related to the choice between concurrent or consecutive sentences does not create an opportunity for legislatures to eliminate the right to a jury trial on elements of the offenses. Nothing in the high court's decisions in *Apprendi, Blakely*, or *Booker* suggests that they apply to factual determinations that

do not serve as the 'functional equivalent' of an element of a crime." *Id.* at 1263, 29 Cal.Rptr.3d 740, 113 P.3d 534.

Following the Supreme Court's remand of *Black (I)* for reconsideration in light of *Cunningham*, the California Supreme Court in *People v. Black,* 41 Cal.4th 799, 805, 62 Cal.Rptr.3d 569, 161 P.3d 1130 (2007) [hereinafter *"Black (II)"* ], again rejected the petitioner's Sixth Amendment challenge to the imposition of consecutive sentences. It noted that *Cunningham* did not address the question whether the principles established in *Blakely* applied to consecutive term sentences under California law. *See Black (II),* 41 Cal.4th at 821, 62 Cal.Rptr.3d 569, 161 P.3d 1130. It then held that *Cunningham* did not undermine its previous conclusion in *Black (I)* that imposition of consecutive terms under Cal.Penal Code § 669 did not implicate a defendant's Sixth Amendment rights. *See id.* It reasoned in this regard that the requirement of Cal.Penal Code § 669 that concurrent sentences be imposed if the court did not specify how the terms must run did not establish a presumption in favor of concurrent sentences, but rather "merely provides for a default in the event the court fails to exercise its discretion." *See id.* at 822, 62 Cal.Rptr.3d 569, 161 P.3d 1130. It further reasoned:

> "In deciding whether to impose consecutive terms, the trial court may consider aggravating and mitigating factors, but there is no requirement that, in order to justify the imposition of consecutive terms, the court find that an aggravating circumstance exists. (*See* § 669; Cal. Rules of Court rule 4.425(a), (b).) Factual findings are not required. In imposing an upper term, the court must set forth on the record 'facts and reasons' (§ 1170, subd.(b)), including the 'ultimate facts that the court deemed to be circumstances in aggravation.' (Cal.

Rules of Court, rule 4.420(e).) But it need only cite 'reasons' for other sentencing choices (§ 1170, subd. (c)), and the reasons given for imposing a consecutive sentence need only refer to the 'primary factor or factors' that support the decision to impose such a sentence. (Cal. Rules of Court, rule 4.406(a), (b); § 1170, subd. (c); *see People v. Tran* (1996) 47 Cal.App.4th 759, 774, 54 Cal. Rptr.2d 905.)" *Id.*

While it could be argued that the distinctions drawn in *Black (II)* between "presumption" and "default" and between "reasons" and "factual findings" are a matter of semantics, the fact remains that both *Blakely* and *Apprendi* only dealt with "increas[ing] the penalty for a crime beyond the prescribed statutory maximum" for that particular individual crime, not with the imposition of consecutive terms for multiple crimes. *See Blakely*, 542 U.S. at 301, 124 S.Ct. 2531; *Apprendi*, 530 U.S. at 476, 120 S.Ct. 2348. Nor did *Cunningham* deal with the imposition of consecutive terms. The issue there was whether assigning to the trial judge, not the jury, authority to find the facts that expose a defendant to an elevated "upper term" sentence for an individual crime violates a defendant's Sixth and Fourteenth Amendment rights to trial by jury. *See Cunningham*, 127 S.Ct. at 860, 127 S.Ct. 856. Further, petitioner has not cited, and the Court has not located, any Supreme Court precedent holding that imposition of consecutive terms implicates a defendant's Sixth Amendment rights. Indeed, the *Apprendi* court specifically declined to address consecutive sentencing and focused instead on the imposition of an enhanced sentence on one particular count. *See Apprendi*, 530 U.S. at 474, 120 S.Ct. 2348. Since the Supreme Court has never held that the rationale of *Apprendi* and its progeny applies to the imposition of consecutive sentences, the Court is unable to find or conclude that the California courts' rejection of petitioner's challenge to the imposition of consecutive sentences under California's sentencing scheme either was contrary to or involved an unreasonable application of clearly established Supreme Court law. *See Wright v. Adams*, No. C06–113 MHP (pr), 2007 WL 3105079 at *8 (N.D.Cal. Oct. 23, 2007) ("there is no 'clearly established' Supreme Court authority applying *Apprendi* and its Supreme Court progeny to consecutive sentences").

## RECOMMENDATION

IT THEREFORE IS RECOMMENDED that the District Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) directing that Judgment be entered denying the First Amended Petition and dismissing this action with prejudice.